## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FAITH A. LENNON,

              *Plaintiff*,

v.

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

Case No. 2:21-cv-12942

District Judge Terrence G. Berg

Magistrate Judge Patricia T. Morris

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 13)

## I.    RECOMMENDATION

Considering the entire record in this case, I suggest that substantial evidence supports the Commissioner of Social Security's determination that Plaintiff, Faith A. Lennon, is not disabled.  Accordingly, I recommend that the Court **DENY** Plaintiff's motion for summary judgment, (ECF No. 11), **GRANT** the Commissioner's motion, (ECF No. 13), and affirm the decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff protectively applied for disability insurance benefits ("DIB") on September 10, 2019, alleging that she became disabled on March 30, 2014.  (8-5, PageID.193–200).  The Social Security Administration denied her DIB claim on

1

January 2, 2020.   (ECF No. 8-3, PageID.92, 106; ECF No. 8-4, PageID.111).

Plaintiff requested a hearing before an ALJ which was held on October 1, 2020.

(ECF No. 8-2, PageID.43, 59).   The ALJ issued a decision on October 22, 2020,

finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(*Id.* at PageID.54).  The Appeals Council denied review on October 25, 2021. (*Id*. at

PageID.28).

Plaintiff filed a complaint seeking judicial review of the ALJ's final decision

on December 17, 2021, and the case was referred to the undersigned the same day.

(ECF Nos. 1, 3).  Both parties later filed cross-motions for summary judgment.  (ECF

Nos. 11, 13).

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The district court's

review is restricted solely to determining whether the "Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x

502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation

marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find

that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most

4

[the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 8-2, PageID.54). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from March 30, 2014, the alleged onset of disability date, through March 31, 2019, Plaintiff's date last insured. (*Id.* at PageID.45). At step two, the ALJ concluded that Plaintiff had the following severe impairments: diabetes mellitus II, hypertension, history of congestive heart failure, obesity, asthma, collagenous colitis, and rheumatoid arthritis. (*Id.*) The ALJ found that Plaintiff's obstructive sleep apnea, gastroesophageal reflux disease, anemia, depression, and anxiety were nonsevere impairments. (*Id.* at PageID.46). At step three, the ALJ decided that none of Plaintiff's severe impairments met or

medically equaled a listed impairment.   (*Id.* at PageID.47).   Next, the ALJ

determined that Plaintiff had a residual functioning capacity to perform light work,[1]

except that she was limited to standing for no more than six hour per day; sitting for

no more than six hours per day; and occasional climbing, balancing, crouching,

kneeling, stooping, and crawling.  (ECF No. 10, PageID.48–49).  Plaintiff also could

not climb "ropes, ladders, or scaffolds," and she had to "avoid hazards such as open

moving machinery and unprotected heights."  (*Id.* at PageID.49).  At step four, the

ALJ found that Plaintiff could perform her past relevant work as a mortgage clerk,

court clerk, or administrative clerk.  (*Id.* at PageID.53).

### E. Background

#### 1. Medical Evidence

Plaintiff stopped working in 2014 after developing colitis which caused her to

have several painful bowel movements each day.  (ECF No. 8-2, PageID.64–67).  In

2017, about one year before her insured status expired, Plaintiff reported to her she

had been having about five to seven "watery stools" per day for the last month.  (*Id.*

at PageID.50; ECF No. 8-10, PageID.753).  Her physician recommended that she

take Budesonide, a medication used to treat colitis, and begin taking a fiber

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b) (2021).

supplement.  (ECF No. 8-10, PageID.753, 761).  Plaintiff followed her doctor's advice, and over the next year, she failed to report any abnormal bowel movements despite regularly meeting with her physician.  (ECF No. 8-2, PageID.50; ECF No. 8-16, PageID.1262; see also ECF No. 8-11, PageID.875–1094).  In Plaintiff's own words, she had been "doing well" while taking Budesonide.  (ECF No. 8-16, PageID.1262).

Indeed, between March 2018 and the expiration of her insured status, Plaintiff did not experience any incontinence until April 2019.  (*Id.*; ECF No. 8-11, PageID.875–1094).  On April 18, 2019, Plaintiff told her physician that she began to experience incontinence again two weeks before her appointment.  (ECF No. 8-16, PageID.1262).  Although her physician did not rule out the possibility that Plaintiff may have experienced a flare up of her colitis, he believed that Plaintiff's symptoms were "more likely" due to an infection.  (*Id.* at PageID.1266).

## 2.  Plaintiff's Testimony at the Administrative hearing

The ALJ began the hearing by examining Plaintiff.  (ECF No. 8-2, PageID.64).  Plaintiff testified that she last worked in 2016 as a home health aide.  (*Id.* at PageID.64–65).  She explained that she stopped working because of her fecal incontinence which caused her to have "quite a few accidents" on the job.  (*Id.* at PageID.65).

Plaintiff's fecal incontinence began in 2014 while she was working as a mortgage coordinator for Fannie Mae. (*Id.* at PageID.65–66). She noticed that she started to take "constant trips to the bathroom", and after a few months, Fannie Mae let her go, purportedly because they did not "need as much help as they had in [her] department . . . ." (*Id.* at PageID.66).

Plaintiff then tried to work as a home health aide for elderly clients, reasoning that she might have better access to a restroom in this type of occupation. (*Id.*) But after a few months, she realized that her incontinence prevented her from performing her job adequately, and she asked to take a break from work "until" she could get her "health in order." (*Id.* at PageID.66–67).

The ALJ then allowed plaintiff's attorney to question her. (*Id.* at PageID.67). Plaintiff testified that she experienced between five and ten "painful" bowel movements throughout an eight-hour workday, each lasting about twenty minutes. (*Id.*) In fact, she would have "accidents" where she did not get to the bathroom in time "a few times" each "week," although this generally occurred at night. (*Id.* at PageID.68). Even when she did not have accidents she would have diarrhea three time per night which caused "extreme fatigue" during the day. (*Id.* at PageID.68–69).

### 3. The Vocational Expert's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ questioned the vocational expert ("VE").  (*Id.* at PageID.76.)  The ALJ asked the VE to assume a hypothetical person of the same age and educational level as Plaintiff who could perform a full range of light work, except that this person could neither stand nor sit for more than six hours in a workday; could only occasionally climb balance, crouch, kneel, stoop, or crawl; and could never climb ropes, ladders, or scaffolds.  (*Id.* at PageID.76).  The hypothetical individual would also "need to avoid hazards such as open moving machinery and unprotected heights, although this did not include "ordinary hazards such as open doors and obstacles on the floor . . . ."  (*Id.* at PageID.76–77).  The VE replied that the hypothetical person could perform Plaintiff's past work as a mortgage clerk, court clerk, [or] administrative clerk."  (*Id.* at PageID.77).

The ALJ then asked the VE to assume the individual from the prior hypothetical, but to further assume that that individual could not stand or walk for more than two hours during an eight-hour day, and could lift no more than ten pounds.  (*Id.*)  The VE testified that this individual could also perform all of Plaintiff's past work.  (*Id.*)

The ALJ next asked the VE to assume the individual from the second hypothetical, but to further assume that the individual required a "low stress environment" with "no quick decision making," no "interaction with the public," only "occasional interaction with coworkers and supervisors."  (*Id.*)  The individual

also could not "perform jobs that are fast paces, [or require] high production or frequent changes in tasks, expectations, or location." (*Id.*)  The VE testified that this individual could not perform Plaintiff's past work.  (*Id.*)  Likewise, the VE testified that an individual who would be off task for "[twenty] percent] or more of a workday" could not "work in a competitive work environment." (*Id.* at PageID.78). Similarly, neither an individual who took an unscheduled break lasting at least ten mints, once per day, nor an individual who would be absent "two to three times a month," could work in a "competitive work environment." (*Id.*)  The VE explained that her testimony was generally consistent with the DOT, but that her statements regarding "unscheduled breaks, absenteeism, off task, [and] fast-paced production" were based on her "education, training, and work experience." (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B) (2018).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

> (1) Licensed physician (medical or osteopathic doctor);
>
> (2) Licensed Psychologist, which includes:

> (i)   A licensed or certified psychologist at the independent practice level; or
>
> (ii)  A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

11

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration ("SSA") "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability."  This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim.  This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]"  *Id.* § 404.1520c(c)(3).  This factor will include the analysis of:

(i)   Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)   Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help

13

> demonstrate the level of knowledge the medical source has of your impairment(s);

> (v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

14

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."   The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).   As such, the SSA "will explain how we considered the

supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings,"

16

meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504.  Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or

nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you

18

are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"  *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled."  *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you."  *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due

19

to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The

regulations establish that "[f]actors relevant to your symptoms, such as pain, which

we will consider include []:

> (i)    [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)    Precipitating and aggravating factors;
>
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get

benefits, you must follow treatment prescribed by your medical source(s) if this

treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated

differently, "[i]f you do not follow the prescribed treatment without a good reason,

we will not find you disabled or, if you are already receiving benefits, we will stop

paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure

to follow prescribed treatment include:

> (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful
         results and the same surgery is again being recommended
         for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart
         surgery), unusual nature (e.g., organ transplant), or other
         reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or
         major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

### 1.     Fecal Incontinence

Plaintiff first argues that the ALJ found an under-restrictive RFC because she

failed to adequately account for Plaintiff's fecal incontinence. (ECF No. 11,

PageID.1312). Specifically, Plaintiff argues that the ALJ should have credited her

testimony that she would need to take at least five, twenty-minute long restroom

breaks during throughout the workday, which, according to the VE, would have

precluded her from obtaining employment. (*Id.*; ECF No. 8-2, PageID.78).

The ALJ completely discredited Plaintiff's allegations, finding that they

described her current condition, rather than her condition while she was insured. (*Id.*

at PageID.49, 52). Disability claimants must be insured to receive benefits. *Garner*

*v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984). Individuals accumulate coverage while

working and may only receive disability benefits if they become disabled before

their insured status expires. *See Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d

679, 680 (6th Cir. 1989). Accordingly, "[e]vidence of a claimant's medical condition after the last insured date is only considered to the extent it illuminates that condition before the expiration of the claimant's insured status." *McAfee v. Comm'r of Soc. Sec.*, No. 1:16-cv-1417, 2018 WL 1516846, at *4 (W.D. Mich. Mar. 28, 2018) *(citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988)); *see also Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849–50 (6th Cir. 2020).

Plaintiff's coverage expired on March 31, 2019, and the ALJ reasonably found that as of that date, Plaintiff's incontinence was under control with medication. (ECF No. 8-2, PageID.43). About one year before her insured status expired, Plaintiff reported to her doctor that for the last month, she had about five to seven "watery stools" per day. (*Id.* at PageID.50; ECF No. 8-10, PageID.753). Noting that Plaintiff previously had success on Budesonide, a medication used to treat incontinence, her physician recommended that she restart Budesonide and begin taking a fiber supplement. (ECF No. 8-10, PageID.753, 761). With the exception of a two-month break, Plaintiff followed her doctor's advice, and over the next year, she failed to report any abnormal bowel movements despite regularly meeting with her physician. (ECF No. 8-2, PageID.50; ECF No. 8-16, PageID.1262; *see also* ECF No. 8-11, PageID.875–1094). In plaintiff's own words, she had been "doing well" while taking Budesonide. (ECF No. 8-16, PageID.1262).

Indeed, between March 2018 and the expiration of her insured status, Plaintiff

did not experience any incontinence. (*Id.*; ECF No. 8-11, PageID.875–1094). On April 18, 2019, Plaintiff told her physician that she began to experience incontinence again two weeks before her appointment. (ECF No. 8-16, PageID.1262). Although her physician did not rule out the possibility that Plaintiff may have experienced a flare up of her colitis, he believed that Plaintiff's symptoms were "more likely" due to an infection. (*Id.* at PageID.1266). The ALJ inferred from this report that Plaintiff's symptoms were caused by an infection, rather than colitis. (ECF No. 8-2, PageID.52).

Plaintiff challenges this inference, arguing that because the physician did not definitively state that an infection caused Plaintiff's symptoms, the ALJ could not rule out the possibility that Plaintiff's symptoms could be attributed to her colitis. (ECF No. 8-16, PageID.1315). But substantial evidence is not such a demanding standard. Although there is some room for doubt, a reasonable person could infer that an infection caused Plaintiff's incontinence. *See Rogers*, 486 F.3d at 241 (explaining that substantial evidence is merely that which "a reasonable mind might accept as adequate to support a conclusion"). The ALJ's finding is supported by substantial evidence even if there are other, reasonable ways to interpret the physician's note. *Cutlip*, 25 F.3d at 286.

And even if the ALJ found that Plaintiff's colitis caused these symptoms, this would not have changed the ALJ's finding that Plaintiff's colitis was under control

with medication on her date last insured.  Plaintiff's insured status expired on March

31, and she did not experience these symptoms until April 4.  (*Compare* ECF No. 8-

2, PageID.43, *with* ECF No. 8-16, PageID.1262).  So, any symptoms she might have

experienced on this date would be irrelevant to her disability claim.  *See Emard*, 953

F.3d at 849–50.[2]

Plaintiff also argues that the ALJ did not support her finding with substantial

evidence for four other reasons.  First, Plaintiff argues that the ALJ improperly

disregarded the side effects of her Budesonide.[3]  (ECF No. 11, PageID.1314–15).

She notes that in April 2020, she told her physician that Budesonide caused her to

gain weight and experience fluctuating blood sugar levels.  (*Id.* at PageID.1314

(citing ECF No. 8-15, PageID.1200)).  This report, of course, occurred well after

Plaintiff's date last insured.  *See Emard*, 953 F.3d at 849–50.  But even to the extent

this report might illuminate the side effects Plaintiff experienced before her date last

insured, the ALJ did not disregard these symptoms.  Indeed, as to her weight gain,

the ALJ found that Plaintiff's obesity was a severe impairment, but she noted that

apart from her shoulders and hips, she Plaintiff displayed normal mobility in most

---

[2] Even if Plaintiff's colitis rendered her disabled before she began taking
Budesonide, the earliest date for which Plaintiff could recover retroactive benefits
would be September 10, 2018—one year before her application date. *See Roso v.
Comm'r of Soc. Sec.*, No. 5:09CV198, 2010 WL 1254831, at *1 n.1 (N.D. Ohio Mar.
11, 2010) (citing 20 C.F.R. §§ 404.615(a)(4), 404.621(a)(1)).

[3] Plaintiff does not appear to argue that the ALJ discounted the severity of her
incontinence because of her decision to stop taking medication.

of her joints.  (ECF No. 8-2, PageID.45, 50).  And to compensate for her obesity, the ALJ imposed a variety of postural limitations and found that Plaintiff could neither stand nor sit for more than six hours per day.  (*See id.* at PageID.48–50).  Likewise, the ALJ found that Plaintiff was diabetic, but she recognized that Plaintiff did not "regularly report[]" any "symptoms or limitations" to her physicians.  (*Id.* at PageID.45, 51).  True, the ALJ did not attribute Plaintiff's obesity and blood sugar issues to her medication, but regardless of what she believed to be the root of Plaintiff's obesity and diabetes, the ALJ discussed both impairments at length and considered their effects on Plaintiff's RFC.  (*Id.* at PageID.45, 48–51).

Second, Plaintiff argues that while her testimony did describe her symptoms at the time of the hearing rather than her date last insured, the ALJ erred by "fail[ing] to elicit testimony focused on the relevant time period."  (ECF No. 11, PageID.1316).  Social security proceedings are inquisitorial, not adversarial.  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Unlike adversarial proceedings where opposing parties bear responsibility for developing the facts in support of their positions, the ALJ in a social security proceeding plays a more active role, bearing the ultimate responsibility for "develop[ing] the facts both for and against granting benefits."  *Id.*; *see also Moats v. Comm'r of Soc. Sec.*, 42 F. 4th 558, 563 (6th Cir. 2022).  But this duty only extends so far.  The ALJ must "not act as counsel," and particularly where a claimant is represented by an attorney, the ALJ's duty to develop the record does

26

not require him or her to leave no stone unturned. *Richardson v. Perales*, 402 U.S. 389, 410 (1971); *see also Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (imposing a *heightened* duty on ALJs to "scrupulously and conscientiously probe into . . . the relevant facts" where a claimant lacks representation). Rather, the ALJ satisfies his or her duties by developing a "full and fair" record. *Lashley*, 708 F.2d at 1051–52.

The ALJ here satisfied her duty to develop a full and fair record as it relates to Plaintiff's incontinence. Indeed, the ALJ obtained Plaintiff's medical records, and at the hearing, she explicitly asked Plaintiff to describe her symptoms when she stopped working in "early 2017"—well before her date last insured. (ECF No. 8-2, pageID.57–58, 62, 65). She then turned the examination over to Plaintiff's counsel, who asked Plaintiff to describe her symptoms generally, without respect to any specific time. (*Id.* at PageID.67–68). Thus, her testimony appeared to describe her symptoms both before and after her date last insured, and the ALJ simply found that her testimony contradicted the medical evidence, which demonstrated that Plaintiff experienced few symptoms, if any, for a year before her date last insured. (*See id.* at PageID.52, 67–68). What Plaintiff describes as a failure "to elicit testimony focused on the relevant period," is nothing more than a reasonable attempt to reconcile Plaintiff's testimony with the objective medical evidence in the record. (ECF No. 11, PaageID.1316). The ALJ therefore obtained both medical evidence

27

and testimony regarding Plaintiff's symptoms during the relevant period. Accordingly, I suggest that the ALJ developed a full and fair record regarding Plaintiff's incontinence. *See Lashley*, 708 F.2d at 1051–52.

Third, Plaintiff argues that the ALJ erred by failing to adopt the state agency physician's opinion that Plaintiff's subjective reports regarding her incontinence were consistent with the record. (ECF No. 11, PageID.1316–17). But because the ALJ found that Plaintiff's incontinence was under control with medication, the ALJ reasonably found that the state agency physician's findings were not persuasive. (ECF No. 8-2, PageID.50, 52). And even if the ALJ adopted the physician's findings, the physician did not find Plaintiff's physical limitations to be severe, and he imposed no functional limitations related to Plaintiff's incontinence. (ECF No. 8-3, PageID.89, 92).

And fourth, Plaintiff argues that because the ALJ found her colitis to be a severe impairment, she must also have found that it caused at least *some* functional limitations. (ECF No. 11, PageID.1312; ECF No. 15, PageID.1362–63). Plaintiff relies primarily on *Jeley v. Comm'r of Soc. Sec.*, where the Southern District of Ohio held that an ALJ erred by neglecting to explain why he imposed no functional limitations related to a claimant's urinary tract infections despite finding that the constituted a severe impairment at step two. No. 2:17-CV-396, 2018 WL 286169, at *5–6 (S.D. Ohio Jan. 4, 2018). The Court reasoned that "by definition," a severe

impairment "significantly limits" a claimant's "ability to do work." *Id.* at *5.  Thus, because the RFC likewise assesses the claimant's "capacity for work," if an ALJ correctly finds an impairment to be severe, then he or she must "include a 'limitation associated with the impairment while fashioning the RFC.'"  *Id.* at *6 (internal quotation marks omitted) (quoting *Lutz v. Comm'r of Soc. Sec.*, No. 2:14-cv-725, 2015 WL 5343660, at *9 (S.D. Ohio Sept. 15, 2015)); 20 C.F.R. § 416.945(a) (2022).  Accordingly, the ALJ's step two finding was inconsistent with his step four finding, and because he neglected to discuss "the extent to which" the claimant's infections take him "off task" throughout "the workday," the court could not determine whether the ALJ's RFC or step two findings were not supported by substantial evidence.  *Id.*

As the Commissioner notes, *Jeley* contradicts other, nonbinding authority in this Circuit.  In *Yang v. Comm'r of Soc. Sec.*, for example, this Court explained that the existence of a severe impairment "does not necessarily establish" any functional limitations.  No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004); *see also Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  The Court reasoned that severity and functional capacity serve two distinct purposes.  The Administration uses the severity standard to screen out impairments that have no more than a "minimal[]" effect on the claimant's ability to work.  *Yang*, 2004 WL 1765480, at *4.  Whereas a claimant's RFC describes "what the claimant can do, not what maladies the claimant suffers from . . . ."  *Id.* at *5.  Thus, the Court held that

while a claimant had "severe" vision loss, the ALJ still "reasonably" found that by correcting his vision, the claimant had no functional limitations. *Id.* at *5.

But *Yang* misstates the distinction between functional limitations and severity. What *Yang* seems to imply is that at step two, an ALJ must consider whether a claimant's impairment is the type of impairment that could potentially affect one's ability to work, and only when assessing the individual's RFC does the ALJ assess the actual effects of the impairment of the claimant's ability to work. *See id.* at *5. That is not what the regulations require. At step two, the regulations provide that the Court must ask whether the impairment "does or "does not" "affect the claimant's ability to work"; not whether the impairment is one that "could" impact a claimant's capacity to work. *Compare* 20 C.F.R. § 404.1522 (2022), and 20 C.F.R. § 416.922 (2022), *with Yang*, 2004 WL 1765480, at *5. And when assessing the effect of an impairment on a claimant's ability to work at step two, the ALJ considers essentially the same abilities that are relevant to determining the Claimant's RFC. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b).

The difference is that at step two, severity is a "de minimis" burden, intended "to screen out claims that are 'totally groundless' . . . ." *Higgs*, 880 F. 2d at 862–63. While a claimant must establish that an impairment interferes with his or her "ability to work," the claimant need only demonstrate more than a "minimal" interference to establish that an impairment is severe. *Id.* But a minimal impact is still an impact.

*Reynolds v. Berryhill*, No. 5:18-CV-00103, 2019 WL 2997398, at *1–2 (W.D. Ky. July 9, 2019). Even though a severe impairment need only have a modest impact on the individual's functional capacity, it still must impact the claimant's RFC in some way. *See, e.g.*, *Griffeth*, 217 F. App'x at *2 (acknowledging that a claimant's severe impairment had a "minimal effect" on the claimant's RFC).[4] So "if the ALJ ultimately" finds that the claimant has "no limitations," then he or she "should [reach] that determination at step two, not when fashioning the RFC." *Lutz*, 2015 WL 5343660, at *9.

Thus, because the ALJ did not account for Plaintiff's incontinence in *any* way at step four, Plaintiff establishes that the ALJ's step two finding was inconsistent with her RFC finding, even if the degree of inconsistency may have been slight. (ECF No. 8-2, PageID.48–49). But from here, Plaintiff takes a logical leap by assuming that it must have been the RFC—not the ALJ's step two finding—that was erroneous.

An inconsistency between a step two determination and an RFC finding means that one, or both, findings were erroneous, but the contradiction does not indicate *which* finding was erroneous. That ambiguity is why the *Jeley* court remanded to the ALJ. 2018 WL 286169, at *6. Despite making contradictory

---

[4] Of course, because severity is such a lenient standard, it may be difficult for a claimant to show how an ALJ's failure to account for a severe impairment in the claimant's RFC was a harmful error.

findings, the ALJ in *Jeley* failed to explain why he found that a severe impairment did not cause any functional limitations, leaving the court to wonder whether the ALJ's RFC or step two finding was erroneous.  *Id.*  But no such mystery exists here. The ALJ left no doubt as to why she found that Plaintiff's incontinence did not limit her functional capacity—for almost an entire year before the expiration of her insured status, Plaintiff kept her incontinence in check with medication.  (ECF No. 8-2, PageID.49–52).  So the ALJ's only "error" was finding that her incontinence constituted a severe impairment.  *See Lutz*, 2015 WL 5343660, at *9.  The Court cannot remand to correct a mistake that was favorable to Plaintiff.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009).

### 2.   Mental Impairments

At step two, the ALJ found that Plaintiff's mental impairments were nonsevere because they had no more than a "mild" impact on her mental functioning.  *See generally* 20 C.F.R. § 404.1520a (2022) (explaining the Administration's technique for evaluating the severity of mental impairments).  Plaintiff argues that after finding her mental impairments were nonsevere, the ALJ failed to discuss, or even consider, the effects of her nonsevere mental impairments on her functional capacity.  (ECF No. 11, PageID.1321–25).  She explains that while the ALJ found her mental impairments to be mild, "[e]ven mild limitations" in mental functioning can "potentially" impact a claimant's functional abilities.  (*Id.* at PageID.1324).  Thus,

the ALJ should have both considered and explained how her mental limitations impacted her functional abilities.

When assessing a claimant's RFC, an ALJ must consider all of the claimant's impairments, both severe and nonsevere. *Emard*, 953 F.3d at 852. But "an ALJ need not specifically discuss" each nonsevere impairment "in the [RFC] assessment" to demonstrate that they were considered. *Id.* at 851–52. Where an ALJ discusses the "functional limitations imposed by" a nonsevere impairment at step two, and then asserts that she considered the effects of each nonsevere impairment when evaluating the claimant's RFC, the Court may take the ALJ at her word, even if the RFC discussion does not mention any of the claimant's nonsevere impairments. *Id.*; *see also Garcia v. Comm'r of Soc. Sec.*, No. 1:19 CV 897, 2020 WL 3620041, at *10 (N.D. Ohio Apr. 21, 2020).

That is exactly what the ALJ did here. At step two, the ALJ discussed the effects of Plaintiff's depression and anxiety on her ability to do basic work activities. (ECF No. 8-2, PageID.46–47). The ALJ then explained that her "residual functional capacity assessment reflects the degree of limitation" she "found in the [step two] analysis." (*Id.* at PageID.47). And, in fact, the ALJ here went a step further then the ALJ in *Emard* by explicitly acknowledging Plaintiff's "depression, anxiety, and fatigue" in her RFC discussion. (*Id.* at PageID.51). As in *Emard*, the ALJ at least considered the effects of Plaintiff's mental impairments on her RFC.

Of course, it is not enough for the ALJ to have simply "considered" the effects of Plaintiff's nonsevere impairments; the ALJ must have articulated her rationale well enough for this Court to understand why she found that Plaintiff's nonsevere, mental impairments did not impact her functional abilities. *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 WL 96920, at *3–4 (6th Cir. 1999) (quoting *Hurst v. Sec'y of Health & Human Servs.*, 753 F. 2d 517, 519 (6th Cir. 1985)). Indeed, Plaintiff is correct that her mental impairment could have "potentially" impacted her functional capacity, and for that reason, most courts hold that where an ALJ finds even mild limitations in concentration at step two, the ALJ must either incorporate these findings into his or her RFC or explain why these mild deficits do not translate into functional limitations. *See, e.g.*, *McIntyre v. Colvin*, 758 F.3d 146, 151–52 (2d Cir. 2014); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180–81 (11th Cir. 2011) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009)); *Lawrence J. v. Saul*, No. 19-1834, 2020 WL 108428, at *3 (N.D. Ill. Jan. 9, 2020).

And here, the ALJ's step two discussion demonstrates why she believed that Plaintiff's mental impairments did not affect her functional abilities. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (reasoning that an ALJ could articulate the rationale for his step three findings in his step two discussion); *see also Emard*, 953 F.3d at 852. At step two, the ALJ explained that Plaintiff "reported no difficulties in memory, concentration, understanding, following instructions, getting

34

along with others, or completing tasks." (ECF No.8-2, PageID.46 (citation omitted)). Plaintiff could independently complete household tasks such as cooking, gardening, and cleaning. (*Id.*) And while she had depression and anxiety, her treatment for these conditions was "conservative" and she "regularly" displayed "unremarkable psychiatric findings" during evaluations. (*Id.*) Although this discussion fell under the ALJ's step two analysis, the ALJ explained that she considered these same findings during her RFC analysis. (*Id.* at PageID.47); *cf. Bledsoe*, 165 F. App'x at 411. Accordingly, the ALJ need not have replicated the same analysis in her RFC discussion. *See Emard*, 953 F.3d at 852. Her decision, as a whole, adequately explains her conclusion that Plaintiff's mental limitations did not affect her functional abilities.

### 3.   Past Relevant Work

Last, Plaintiff argues that even if the ALJ found a reasonable RFC, her step four finding still was not supported by substantial evidence because she neglected to obtain "detailed testimony regarding the duties of [Plaintiff's] past relevant skilled work" as required by SSR 82-62. (ECF No. 11, PageID.1319). Because the ALJ failed to "address the specific duties" of Plaintiff's past work, he could not determine whether her RFC precluded her from performing these jobs. (*Id.*)

Under SSR 82-62, an ALJ cannot find that a claimant "has the capacity to perform a past relevant job" without first making a "finding of fact" as to "the

individual's RFC" and the "physical and mental demands of the past [occupation."

SSR 82-62, 1982 WL 31386, at *4 (Jan. 1, 1982).  Only once an ALJ finds these two

facts can he or she determine whether the claimant's RFC "would permit" him or

her to "return to his or her past job or occupation."  *See id.*

However, almost two decades after the Administration promulgated SSR 82-

62, it amended its regulations to clarify that ALJs can rely solely on VE testimony

to determine whether a claimant can perform his past relevant work.  *Hamm v.*

*Colvin*, No. 4:14-cv-03590-RBH, 2016 WL 536742, at *3–4 (D.S.C. Feb. 11, 2016).

Importantly, the VE need not know the specific duties of the claimant's past work

for an ALJ to rely on his or her testimony.  The Commissioner can meet its burden

at step four by demonstrating that the claimant "can meet the demands" of his or her

prior work "either as the claimant actually performed it or as" the job is "generally

performed in the national economy."  *Id.* (citing 20 C.F.R. § 404.1560(b)(2)).  The

VE need not know the specific job duties of the claimant's past relevant work to

opine on how a particular job is "generally performed in the national economy."  *Id.*;

*see also Lake v. Kijakazi*, No. 2:21-cv-01089, 2022 WL 855975, at *4 (D. Nev. Mar.

23, 2022).  Thus, "an ALJ may properly rely on the testimony of a vocational expert

in lieu of himself describing the physical and mental demands of the past job."

*Hamm*, 2016 WL 536742, at *4; *see also Razmik v. Saul*, No. 2:19-cv-08970-KES,

at *5 (C.D. Cal. June 23, 2020); *McDonald v. Comm'r of Soc. Sec.*, No. 13-12312, 2014 WL 1922790, at *11 (E.D. Mich. May 14, 2014).

Accordingly, here, the ALJ need not have listed the demands of each of Plaintiff's past jobs to determine whether Plaintiff could perform her prior work. The VE knew which jobs Plaintiff performed, and she testified that an individual with Plaintiff's RFC could perform Plaintiff's past work as that work is generally performed in the national economy. (ECF No. 8-2, PageID.53, 77). Accordingly, I suggest that the ALJ properly relied on this testimony to find that Plaintiff could perform her past work. *See Hamm*, 2016 WL 536742, at *4.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 11), **GRANTING** the Commissioner's Motion (ECF No. 13), and affirming the decision.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 8, 2022                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge